UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| SHARPE HOLDINGS, INC., a Missouri Corporation, | ) ) ) | |
| OZARK NATIONAL LIFE INSURANCE COMPANY, a Missouri Corporation, | ) ) ) | |
| CNS CORPORATION, a Missouri Corporation, | ) ) ) | |
| N.I.S. FINANCIAL SERVICES, INC., a Missouri Corporation, | ) ) ) | |
| CNS INTERNATIONAL MINISTRIES, INC., a Missouri Non-Profit Corporation, | ) ) ) | |
| HEARTLAND CHRISTIAN COLLEGE, A Missouri Non-Profit Corporation, | ) ) | Case No. 2:12-cv-00092-DDN |
| CHARLES N. SHARPE, a Missouri resident, | ) ) ) | |
| JUDI DIANE SCHAEFER, a Missouri resident, and | ) ) ) | |
| RITA JOANNE WILSON, a Missouri resident, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| KATHLEEN SEBELIUS, in her official capacity as the Secretary of the United States Department of Health and Human Services, | ) ) ) ) ) | |
| UNITED STATES DEPARTMENT OF THE TREASURY, | ) ) | |

Exhibit 1

JACOB J. LEW, in his official            )
capacity as the Secretary of the United  )
States Department of the Treasury,       )
                                         )
UNITED STATES DEPARTMENT OF              )
LABOR, and                               )
                                         )
THOMAS E. PEREZ, in his official         )
Capacity as the Secretary of the United  )
States Department of Labor,              )
                                         )
            Defendants.                  )

## SECOND AMENDED COMPLAINT

Plaintiffs Sharpe Holdings, Inc., Ozark National Life Insurance Company, CNS

Corporation, N.I.S. Financial Services, Inc., CNS International Ministries, Inc., Heartland

Christian College, Charles N. Sharpe, Judi Diane Schaefer and Rita Joanne Wilson, for their

Second Amended Complaint, state:

## NATURE OF THE ACTION

1.      This case challenges regulations issued under the Patient Protection and

Affordable Care Act of 2010 ("Act") that force the Plaintiffs to either (a) violate their sincerely-

held religious opposition to abortion on demand or (b) pay heavy fines and penalties (Sharpe

Holdings, Inc., Ozark National Life Insurance Company, CNS Corporation, N.I.S. Financial

Services, Inc., CNS International Ministries, Inc., Heartland Christian College, and Charles N.

Sharpe) or lose health insurance coverage and pay fines (Judi Diane Schaefer and Rita Joanne

Wilson).

2.      Sharpe Holdings, Inc. ("Sharpe Holdings") is a Missouri for-profit general

business corporation that employs more than 50 men and women in a variety of industries,

including, but not limited to, farming, dairy, creamery, and cheese-making.  Sharpe Holdings

offers health insurance to its employees through its own self-insured program.  This is the same

self-insured program used by all the Plaintiffs in this case, and will be referred to herein simply as "the self-insured program."

3.      Ozark National Life Insurance Company ("Ozark") is a Missouri for-profit insurance corporation that employs more than 50 men and women.  Ozark offers health insurance to its employees through the self-insured program.

4.      N.I.S. Financial Services, Inc. ("N.I.S.") is a Missouri for-profit general business corporation that employs fewer than 50 men and women.  N.I.S. is a mutual fund broker.  N.I.S. offers health insurance to its employees through the self-insured program.

5.      CNS Corporation is a Missouri for-profit general business corporation that employs fewer than 50 men and women.  CNS Corporation is the holding company for Sharpe Holdings, Ozark and N.I.S.  CNS Corporation offers health insurance to its employees through the self-insured program.

6.      CNS International Ministries, Inc. ("CNS Ministries") is a Missouri non-profit corporation that provides full-time residential services to men, women and children who suffer from alcohol or drug dependencies and behavioral problems.  CNS Ministries, located in the Missouri counties of Lewis, Knox and Shelby, employs more than 50 men and women.  Charles N. Sharpe is its founder, chairman and president.  CNS Ministries offers health insurance to its employees through the self-insured program.

7.      Heartland Christian College is a Missouri non-profit corporation that provides post-secondary higher education to employees and residents of CNS International Ministries and their dependents, in addition to others.  It is part of the same community in which CNS Ministries and Sharpe Holdings participate.  Heartland Christian College offers health insurance

to its employees through the self-insured program.  Charles N. Sharpe is the founder of Heartland Christian College.

8.     Sharpe Holdings, Ozark, CNS Corporation, N.I.S., CNS Ministries and Heartland Christian College will hereafter be collectively referred to as "the Corporate Plaintiffs."

9.     Charles N. Sharpe is the founder, owner, chairman of the board and chief executive officer of Sharpe Holdings; the founder, owner, president and chairman of the board of Ozark; the founder, owner and chairman of the board of N.I.S; the founder, owner, president and chairman of the board of CNS Corporation; the president, founder, chairman of the board and chief executive officer of CNS Ministries; and the founder of Heartland Christian College.  Mr. Sharpe is responsible for setting all policies governing the conduct of all phases of the businesses of the Corporate Plaintiffs (except for Heartland Christian College, which has an independent board, but nevertheless fully concurs with the views of its founder, Mr. Sharpe, regarding the matters at issue in this suit).  Mr. Sharpe strives to operate the Corporate Plaintiffs (other than Heartland Christian College, which he does not control but which concurs herein) according to Christian principles and coinciding sincerely held religious beliefs.

10.     Judi Diane Schaefer and Rita Joanne Wilson are Sharpe Holdings employees. Health insurance coverage is a benefit of Schaefer's and Wilson's employment at Sharpe Holdings.  Schaefer and Wilson pay a portion of the premiums required in order to maintain their coverage.  Said premiums partially fund medical services provided to other employees covered under the same plan.  Schaefer and Wilson oppose the use, funding, provision or support of abortion on demand as a matter of sincerely held religious belief and practice.

11.     The Plaintiffs' sincerely held religious beliefs forbid them from funding, participating in, paying for, sharing the costs of, training others to engage in, or otherwise supporting or providing a means of abortion on demand.

12.     The Plaintiffs do not believe that abortion on demand constitutes medicine, health care, or a means of providing for the well-being of persons.  Rather, Plaintiffs believe abortion on demand involves gravely immoral practices and the intentional destruction of innocent human life.

13.     The Defendants have issued an administrative rule ostensibly pursuant to authority created by the Act requiring that group health plans cover, without cost sharing, "all Food and Drug Administration-approved contraceptive methods, sterilization procedures and patient education and counseling for all women with reproductive capacity" in plan years beginning as early as August 1, 2012.  Such contraceptive methods include certain drugs and devices such as the "Plan B" and "ella" pills and copper IUDs, all of which are widely known as abortifacients in that they frequently function to destroy fertilized eggs, which Plaintiffs consider to be abortion on demand.  This mandate to provide coverage for abortifacient drugs (hereinafter, the "Mandate") not only forces the Plaintiffs to treat abortion on demand and related education and counseling as health care, but also subverts the expression of the Plaintiffs' religious beliefs (which they share with millions of other Americans), by forcing them to fund, promote, and assist and participate in the provision of the acquisition of drugs and services which they believe involve gravely immoral practices, including the intentional destruction of innocent human life.

14.     The Mandate unconstitutionally forces the Plaintiffs to violate their sincerely held religious beliefs—under threat of heavy fines and penalties for the Corporate Plaintiffs and Charles N. Sharpe, and under threat of lost health coverage and fines for Judi Diane Schaefer and

Rita Joanne Wilson at Sharpe Holdings.  The Mandate also forces the Plaintiffs to fund government-dictated speech that is directly at odds with their own speech and religious teachings.  Having to pay a fine to government authorities for the privilege of practicing one's religion or controlling one's own speech is un-American, unprecedented, and flagrantly unconstitutional.  Forcing an employee to fund government-dictated speech that is directly at odds with her own speech and religious teachings, in order to maintain insurance as a job benefit, is similarly wrong.

15.     The Defendants' refusal to accommodate conscience is selective.  A patchwork of exemptions shows that Defendants do not believe every insurance plan in the country needs to cover these services.  For instance, Defendants have issued thousands of waivers from the Act (in its entirety) for many large corporations and labor unions, purely for reasons of commercial or political convenience.  Other exemptions have been awarded based on how old a plan is, or how large an employer is.  There are several other exemptions from the Act and from the Mandate, for a variety of groups and for a variety of reasons, including exemptions for certain narrowly defined religious employers that have found favor with the Defendants.  There is, however, no exemption for for-profit religious employers, the employees they insure, or nonprofit religious employers that are not churches.  Plaintiffs fall into these categories.

16.     The government has instituted an alleged "accommodation" for religious non-profits like CNS Ministries and Heartland Christian College in which third party insurance providers or administrators supposedly provide the objectionable drugs and devices directly to requesting employees.  This "accommodation" is a shell game, as the non-profits' employment of its employees is still the direct cause of the provision to them of abortifacients and coverage for same.

17.     Defendants acted with full knowledge of the beliefs of thousands of employers and the employees they insure, like the Plaintiffs, and because they arbitrarily exempt some plans for a wide range of reasons other than religious conviction, the Mandate can be interpreted as nothing other than callous disregard of the religious beliefs of the Plaintiffs and many other Americans.  The Defendants accordingly seek refuge in this Court.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,1343(a)(4), 1346(a)(2), and 1361.  This action arises under the Constitution and laws of the United States.  This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

19.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e).

## THE PARTIES

20.     Plaintiff Sharpe Holdings is a for-profit Missouri corporation residing in Shelby County, Missouri.

21.     Plaintiff Ozark is a for-profit Missouri corporation residing in Jackson County, Missouri.

22.     Plaintiff CNS Corporation is a for-profit Missouri corporation residing in Jackson County, Missouri.

23.     Plaintiff N.I.S. is a for-profit Missouri corporation residing in Jackson County, Missouri.

24.     Plaintiff CNS Ministries is a non-profit Missouri corporation residing in Shelby County, Missouri.

25. Plaintiff Heartland Christian College is a non-profit Missouri corporation residing in Knox County, Missouri.

26. Charles N. Sharpe is the founder, owner, chairman of the board and chief executive officer of Sharpe Holdings; the founder, owner, president and chairman of the board of Ozark; the founder, owner and chairman of the board of N.I.S; the founder, owner, president and chairman of the board of CNS Corporation; the president, founder, chairman of the board and chief executive officer of CNS Ministries; and the founder of Heartland Christian College.  He is a resident of Shelby County, Missouri.

27. Plaintiff Judi Diane Schaefer is an individual residing in Shelby County, Missouri.

28. Plaintiff Rita Joanne Wilson is an individual residing in Shelby County, Missouri.

29. Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

30. Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS").  In this capacity, she has responsibility for the operation and management of HHS.  Sebelius is sued in her official capacity only.

31. Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

32. Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.  In this capacity, he has responsibility for the operation and management of the Department of Labor.  Perez is sued in his official capacity only.

33.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

34.     Defendant Jacob J. Lew is the Secretary of the Department of the Treasury.  In this capacity, he has responsibility for the operation and management of the Department.  Lew is sued in his official capacity only.

35.     Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

## FACTUAL ALLEGATIONS

## I.     Plaintiffs' Religious Beliefs and Practices Related to Abortion

36.     Charles N. Sharpe is the founder, owner, chairman of the board and chief executive officer of Sharpe Holdings; the founder, owner, president and chairman of the board of Ozark; the founder, owner and chairman of the board of N.I.S; the founder, owner, president and chairman of the board of CNS Corporation; the president, founder, chairman of the board and chief executive officer of CNS Ministries; and the founder of Heartland Christian College.  Mr. Sharpe is responsible for setting all policies governing the conduct of all phases of the activities of the Corporate Plaintiffs, except for the religious non-profit Heartland Christian College, which he founded but does not govern.  He strives to make sure the Corporate Plaintiffs' activities are in accordance with Christian principles and coinciding sincerely held religious beliefs.  He is also a minister of the gospel.

37.     Sharpe Holdings is a Missouri, for-profit corporation that employs individuals in a variety of industries, including but not limited to, farming, dairy, creamery and cheese-making.

Sharpe Holdings promotes the Christian beliefs, practices, and aspirations espoused by its

founder and owner, Charles N. Sharpe.  Outward examples include its milk tankers, which are

emblazoned with the message "Jesus is the Answer," and its milk and cheese products, marketed

under the name of Heartland Creamery, which substitute the "T" in Heartland with a Christian

cross.

38.    The Sharpe Holdings website describes the corporation's various enterprises and

contains several demonstrations of its faith-based mission, including, for instance, the front page

of the website which is subtitled "Transforming Hearts and Lives through the Power of Jesus

Christ."  *See* http://www.sharpeholdingsinc.com/.

39.    Sharpe Land & Cattle is a division within Sharpe Holdings.  The Sharpe Holdings

website says the following of Sharpe Land & Cattle:

> The goal of Sharpe Land & Cattle goes far beyond the further growth of an already thriving
> agricultural enterprise. The heart behind the organization aspires to help people rebuild
> their lives through the changing power of Jesus Christ. By modeling their work ethic before
> the men at the Recovery Center, and by providing vocational opportunities for those in their
> community, the staff of Sharpe Land & Cattle strives to implement Godly principles in
> every aspect of their business. By remaining true to this calling, Sharpe Land & Cattle has
> experienced a sovereign move of God—and they plan to continue operating under God's
> blessing.

http://www.sharpeholdingsinc.com/slc.html.

40.    Ozark is a Missouri, for-profit life insurance company.

41.    N.I.S. is a Missouri, for-profit securities broker/dealer.

42.    Ozark and N.I.S. work in conjunction in providing an insurance/investment

product called The Balanced Program that combines mutual fund investment and life insurance.

43.    Ozark and N.I.S. share a website, which states that "Ozark National Life is

proud to be associated with" and supports Heartland Ministries.  http://www.ozark-

national.com/connect.aspx.  There is a link to the Heartland Ministries website, whose

homepage states, among other things, "Jesus is the answer!"  http://heartland-ministries.org.

Charles N. Sharpe is the founder and head pastor for Heartland Ministries.

44.     CNS Corporation is a Missouri, for-profit corporation that serves as a holding

company for Sharpe Holdings, Ozark and N.I.S.

45.     CNS Ministries provides full-time residential services to men, women and

children who suffer from alcohol or drug dependencies or other behavioral problems.

46.     Heartland Christian College is a Missouri non-profit corporation that provides

post-secondary higher education to employees and residents of CNS International Ministries

and their dependents, in addition to others.  It is part of the same community in which CNS

Ministries and Sharpe Holdings participate.

47.     Christian belief and practice are integral to the identities of the Corporate

Plaintiffs, and adherence to Christian tenets is a deeply and sincerely integral aspect of the

Corporate Plaintiffs.

48.     The Corporate Plaintiffs seek to defend and promote certain moral and ethical

standards in their employees, including not just teaching them a life-sustaining work ethic but

also promoting a belief in the sanctity and quality of life which precludes abortion on demand

through abortifacient drugs and devices or otherwise.

49.     As part of their religious missions, the Corporate Plaintiffs promote the well-

being and health of their employees.  In furtherance of these commitments, the Corporate

Plaintiffs ensure that their employees have comprehensive medical coverage.  The Corporate

Plaintiffs all utilize the same self-insured plan.  The plan purposely excludes coverage for

abortions or abortifacient drugs or devices.

50.     Judi Diane Schaefer and Rita Joanne Wilson are Sharpe Holdings employees.

Health insurance coverage is a benefit of their employment at Sharpe Holdings.  They pay a portion of the premiums required in order to maintain this coverage.  Said premiums partially fund medical services provided to other employees covered under the same plan.

51.     Mr. Sharpe, Ms. Schaefer and Ms. Wilson oppose the use, funding, provision or support of abortion on demand as a matter of sincerely held religious belief and practice.

52.     The Plaintiffs cannot provide, fund or in any way be a participant in the provision of health care coverage for abortions or abortifacient drugs and devices, or related education and counseling, without violating their deeply and sincerely held religious beliefs.

53.     The Plaintiffs cannot provide, fund or in any way be a participant in the provision of information or guidance to others under the same insurance plan about locations at which they can access abortifacients, or related education and counseling, without violating their deeply and sincerely held religious beliefs.

54.     The Sharpe Holdings health insurance plan year began on January 1, 2013.  The Ozark, CNS Corporation and N.I.S. plans formerly began on July 1, 2013, but now begins, with all the other corporations, on January 1, 2014.  The plan year for CNS Ministries and Heartland Christian College begins on January 1, 2014.

## II.     Abortifacient Drugs and Devices

55.     "Plan B" (levonorgestrel) was approved by the Food and Drug Administration ("FDA") as a prescription-only drug product on July 28, 1999 and was approved by the FDA for over-the-counter sales on August 24, 2006 for women 18 years of age and older and by prescription for those 17 or younger.  It is to be taken within three days after unprotected sex. On July 9, 2009, a more potent version, Plan B One Step, was approved by the FDA with the same restrictions.  Next Choice is another FDA-approved levonorgestrel abortifacient.  *See*

FDA Birth Control Guide, available at http://www.fda.gov/downloads/ForConsumers/

ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited May 27, 2013).

56.     "ella" (ulipristal acetate) was approved by the FDA on August 13, 2010.  ella is

a prescription-only drug product which is taken within five days after a contraceptive failure or

unprotected sex.  *See* FDA Birth Control Guide, available at http://www.fda.gov/downloads/

ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited May

27, 2013).

57.     Copper IUDs (intra-uterine devices) were approved by the FDA in 1984.  *See*

FDA Birth Control Guide, available at http://www.fda.gov/downloads/ForConsumers/

ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited May 27, 2013).

58.     Each of the aforementioned abortifacient drugs or devices frequently operates by

stopping a fertilized egg from being implanted into the uterus.

### III.    The Affordable Care Act

59.     In March 2010, Congress passed and President Obama signed into law the

Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health

Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known

as the "Affordable Care Act."

60.     The Act regulates the national health insurance market by directly regulating

"group health plans" and "health insurance issuers."

61.     The Act does not apply equally to all insurers, employers or individuals.

62.     The Act does not apply its fine and penalty provisions for failure to offer

employer-sponsored insurance to employers with fewer than 50 employees, not counting

seasonal workers.  26 U.S.C. § 4980H(c)(2)(A).

63. The Act is not generally applicable because it provides for numerous exemptions from its rules.

64. The Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans. Given plan changes since March 23, 2010, the Plaintiffs' health insurance plan does not qualify as a grandfathered health plan. *See* 42 U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.

65. Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

66. HHS has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of small employers with between 50 and 100 employees may do likewise. *See* Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans, available at http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-havegrandfathered.html (last visited May 27, 2013). According to government estimates, a total of 191 million Americans belong to plans that may be grandfathered under the Act. Interim Final Rules for Group Health Plans and Health Insurance Coverage Relating to Status as a Grandfathered Health Plan Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 34538, 34540 (June 17, 2010).

67. In addition to grandfathering under the Act, the preventive care guidelines exempt certain religious employers (as more fully described *infra*) from any requirement to cover contraceptive services. 45 C.F.R. § 147.130(a)(iv)(B).

68. The Act is not neutral because some groups, both secular and religious, enjoy exemptions from the law, while certain religious groups do not.

14

69.     None of the several exemptions from the law applies to any of the Plaintiffs.

70.     Certain provisions of the Act do not apply equally to members of certain religious groups.  *See, e.g.,* 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of a "health care sharing ministry" that meets certain criteria).

71.     The Department of Health and Human Services has the authority under the Act to grant compliance waivers ("HHS waivers") to employers and other health insurance plan issuers.  HHS waivers release employers and other plan issuers from complying with the provisions of the Act.  HHS decides whether to grant waivers based on individualized waiver requests from particular employers and other health insurance plan issuers.  Upon information and belief, more than a thousand HHS waivers have been granted.  The Act is not neutral because some religious groups have received HHS waivers while other religious groups have not.

72.     The Act is not generally applicable because Defendants have granted numerous waivers from complying with the Act's requirements.

73.     The Act is not generally applicable because it does not apply equally to all individuals and plan issuers.

74.     Defendants' waiver practices create a system of individualized assessments to qualify for an exemption.

75.     Violations of the Act can subject an employer, an insurer and individuals to substantial monetary penalties.

76.     Under the Internal Revenue Code, certain employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to significant annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a), (c)(1).

77.     Additionally, under the Internal Revenue Code, group health plans that fail to provide certain required coverage may be subject to an assessment of $100 a day per individual.  *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro, Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that this applies to employers who violate the "preventive care" provision of the Act).

78.     Under the Public Health Service Act, the Secretary of HHS may impose a monetary penalty of $100 a day per individual where an insurer fails to provide the coverage required by the Mandate.  *See* 42 U.S.C. § 300gg-22(b)(2)(C)(i); *see also* Cong. Research Serv., RL 7-5700 (asserting that this penalty applies to insurers who violate the "preventive care" provision of the Affordable Care Act).

79.     ERISA may provide for additional penalties.  Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits.  29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700.  Similarly, the Secretary of Labor may bring an enforcement action against group health plans of employers that violate the U.S. Government Mandate, as incorporated by ERISA.  *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700 (asserting that these penalties can apply to employers and insurers who violate the "preventive care" provision of the Affordable Care Act).

16

IV.     **The Preventive Care Mandate**

80.     The Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for[,] . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration," and directs the Secretary of HHS to determine what would constitute "preventive care" under the mandate.  42 U.S.C. § 300gg—l3(a)(4).

81.     On July 19, 2010, HHS, along with the Department of Treasury and the Department of Labor, published an interim final rule under the Act.  75 Fed. Reg. 41726 (2010).  The interim final rule requires providers of group health insurance to cover preventive care for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date.  75 Fed. Reg. 41759 (2010).

82.     A number of groups filed comments warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of "health care," including abortion on demand and abortifacients.

83.     HHS directed an independent, non-profit private health policy organization, the Institute of Medicine ("IOM"), to suggest a list of recommended guidelines describing which drugs, procedures, and services should be covered by all health plans as preventive care for women.  *See* Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines (last visited May 27, 2013).

84.     In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans.  These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists, John

17

Santelli, the National Women's Law Center, National Women's Health Network, Planned

Parenthood Federation of America, and Sara Rosenbaum.

85.    No religious groups or other groups that oppose government-mandated coverage

of abortion and related education and counseling were among the invited presenters.

86.    One year after the first interim final rule was published, on July 19, 2011, the

IOM published its recommendations.  It recommended that the preventive services include "All

Food and Drug Administration approved contraceptive methods [and] sterilization procedures."

Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (July 19,

2011).

87.    FDA-approved "contraceptive" methods include birth-control pills; prescription

contraceptive devices, including IUDs; Plan B**,** also known as the "morning-after pill";

ulipristal, also known as "ella" or the "week-after pill"; and other drugs, devices, and

procedures.  *See* FDA Birth Control Guide, available at http://www.fda.gov/downloads/

ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited May

27, 2013).

88.    Thirteen days later, on August 1, 2011, without notice of rulemaking or

opportunity for public comment, HHS, the Department of Labor, and the Department of

Treasury adopted the IOM recommendations in full and promulgated an interim final rule (the

Mandate), which requires that all "group health plan[s] and . . . health insurance issuer[s]

offering group or individual health insurance coverage" provide all FDA-approved

contraceptive methods and sterilization procedures. 76 Fed. Reg. 46621 (published Aug. 3,

2011); 45 C.F.R. § 147.130.  On the same day the Health Services and Resources

Administration ("HRSA") issued guidelines adopting the IOM recommendations.  *See*

Women's Preventive Services: Required Health Plan Coverage Guidelines,

http://www.hrsa.gov/womensguidelines (last visited May 27, 2013).

89.     The Mandate also requires group health care plans and issuers to provide

education and counseling, including on the subject of abortifacients, for all women

beneficiaries with reproductive capacity.

90.     The Mandate went into effect immediately as an "interim final rule."

91.     HHS did not adequately accommodate the concerns of religious organizations

or individuals in the comments submitted before the Mandate was issued.  The Mandate was

unresponsive to the concerns stated in the comments submitted by religious organizations.

92.     When it issued the Mandate, HHS requested comments from the public by

September 30, 2011, and indicated that comments would be available online.  Upon

information and belief, over 100,000 comments were submitted against the Mandate.

93.     On October 5, 2011, six days after the comment period ended, Defendant

Sebelius gave a speech at a fundraiser for NARAL (National Abortion Rights Action League)

Pro-Choice America.  She told the assembled crowd that "we are in a war."

94.     The Mandate fails to take into account the statutory and constitutional

conscience rights of religious organizations and individuals like the Plaintiffs.

95.     The Mandate requires that the Plaintiffs provide coverage for or otherwise

participate in the provision of abortifacients and related education and counseling against

Plaintiffs' religiously informed consciences.

96.     The Mandate constitutes government-imposed pressure and coercion on the

Plaintiffs to change or violate their religious beliefs and practices.

97.     The Mandate exposes the Corporate Plaintiffs and Charles N. Sharpe to

19

substantial fines, and, in the case of Judi Diane Schaefer and Rita Joanne Wilson, jeopardizes access to affordable health insurance and exposes them to fines, because of Plaintiffs' refusal to change or violate their religious beliefs and practices.

98.     The Mandate forces the Plaintiffs to provide, fund or participate in the provision of abortifacients and related education and counseling in violation of their religious beliefs, conduct which is equivalent to assisting another to intentionally destroy innocent human life.

99.     It is the Plaintiffs' sincerely held religious belief that human life begins at conception.

100.    The Plaintiffs believe that abortifacients such as Plan B, ella and copper IUDs can and do prevent the implantation of a human embryo in the wall of the uterus, and therefore can and do cause the death of the embryo, which is a human life.

101.    Plan B, ella and copper IUDs can and do prevent the implantation of a human embryo in the wall of the uterus. Plan B, ella and copper IUDs can and do cause the death of the embryo. The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus constitutes an "abortion" as that term is used in federal law and as that term is understood by Plaintiffs. The use of artificial means to cause the death of a human embryo constitutes an "abortion" as that term is used in federal law and as that term is understood by Plaintiffs.

102.    The Mandate forces the Plaintiffs to provide, fund or participate in the provision of abortifacients such as Plan B, ella and copper IUDs, free of charge, regardless of the ability of employees to obtain these drugs from other sources.

103.    The Mandate forces the Plaintiffs to fund or to otherwise participate in the

provision of education and counseling concerning abortion that directly conflicts with the Plaintiffs' religious beliefs and/or teachings.

104.    The Corporate Plaintiffs and Charles N. Sharpe cannot terminate their employees from health insurance coverage without violating their religious duty to provide for the health and well-being of their employees, and would be hampered in their ability to hire and retain qualified employees if they were unable to provide health insurance.  Additionally, employees such as Judi Diane Schaefer and Rita Joanne Wilson would be unable to attain similar coverage in the market as it exists today.

105.    The Mandate forces the Plaintiffs to choose among violating their religious beliefs, incurring substantial fines, or terminating their employee health care plans.

106.    Providing counseling and education about abortion directly undermines and subverts the explicit messages and speech of the Plaintiffs.  Being compelled to provide such counseling and education constitutes compelled speech, in violation of the First Amendment. Being compelled to refer to abortifacients as "preventive care" also constitutes compelled speech in violation of the First Amendment.

**V.    The Narrow and Discretionary Religious Exemption**

107.    The Mandate indicates that the HRSA "may" grant religious exemptions to certain religious employers. 45 C.F.R. § 147.130(a)(iv)(A).  The Mandate at first allowed the HRSA to grant exemptions for "religious employers" who "meet[ ] all of the following criteria: (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section

6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. §

147.130(a)(iv)(B).

108.    On January 20, 2012, Defendant Sebelius announced that there would be no

change to the narrow religious exemption.  She added that "[n]onprofit employers who, based

on religious beliefs, do not currently provide contraceptive coverage in their insurance plan,

will be provided an additional year, until August 1**,** 2013, to comply with the new law," on the

condition that those employers certify that they qualify for the one-year extension.  At the

same time, however, Sebelius announced that HHS "intend[s] to require employers that do not

offer coverage of contraceptive services to provide notice to employees, which will also state

that contraceptive services are available at sites such as community health centers, public

clinics, and hospitals with income-based support." *See* Statement by U.S. Dep't of Health and

Human Services' Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/

2012pres/ 01/20120120a.html (last visited May 27, 2013).

109.    After receiving complaints regarding the narrow nature of the religious

employer exemption, the Defendants altered the exemption so that a "religious employer"

would be one "that is organized and operates as a nonprofit entity and is referred to in section

6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 8461.

110.    In other words, religious organizations like the Plaintiffs that are not churches,

integrated auxiliaries, or religious orders would continue to be denied the protection of the

exemption.

111.    None of the Corporate Plaintiffs, although religious employers, qualifies as a

church or an integrated auxiliary of a church.

## VI.    The Mandate Becomes Final, Without Change.

112.    On February 10, 2012, President Obama held a press conference at which he announced an intention to initiate, at some unspecified future date, a separate rulemaking process that would work toward creating a different contraceptive services mandate.  This promised mandate would, the President stated, attempt to take into account the kinds of religious objections voiced against the original Mandate contained in the interim final rule.

113.    On that same day—February 10, 2012—the Defendants issued a "guidance bulletin" describing a "Temporary Enforcement Safe Harbor" ("Safe Harbor") from the Mandate.  The Safe Harbor applied to "non-exempted, non-grandfathered group health plans established and maintained by non-profit organizations with religious objections to contraceptive coverage (and any health insurance coverage offered in connection with such plans)."  Under the Safe Harbor, the Defendants stated that qualifying organizations would not be subject to enforcement of the Mandate "until the first plan year that begins on or after August 1, 2013," provided they meet certain criteria outlined in the guidance bulletin.

114.    The Corporate Plaintiffs, though religious employers with religious objections to certain contraceptive (as that term is used by the FDA) coverage, do not qualify for the Safe Harbor because they are for-profit corporations.

## VII.    The Defendants' Proposed "Accommodation" For Religious Nonprofits

115.    On June 28, 2013, The Defendants issued final rules that laid out an "accommodation" for non-exempt, nonprofit religious organizations by making them "designate" their insurers and third party administrators to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

116.    The "accommodation" did not resolve the concerns of religious nonprofit

23

organizations like CNS Ministries, which are forced to provide coverage that necessarily includes and triggers access to abortion-inducing drugs and related education and counseling. The "accommodation" did not resolve the concerns of smaller (under 50 employees) organizations like Heartland Christian College, which are forced, if they choose to provide health coverage to their employees, to provide coverage that includes or triggers access to abortion-inducing drugs and related education and counseling.

117.    "[O]ver 400,000 comments" were submitted in response to the announcement of the "accommodation," 78 Fed. Reg. 39870, 39871, with religious organizations again overwhelmingly decrying the proposed "accommodation" as a violation of their religious liberty because it would conscript their health care plans as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

118.    On April 8, 2013, the very day that the notice-and-comment period ended, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

119.    In her remarks, Secretary Sebelius stated:

We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities will be providing coverage to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese will be included in the benefit package.

*See* The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, available at http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (Episode 9 at 2:25) (emphasis added).

120.    Given the timing of these remarks, it is clear that Defendants gave no

consideration to the comments submitted in response to the proposed "accommodation."

121.    Moreover, Secretary Sebelius' remarks belie the assertion that objecting employers are not actually "providing coverage for" morally objectionable items in the health insurance plans they provide employees.

122.    An organization is eligible for the "accommodation" if it (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874.

123.    CNS Ministrites and Heartland Christian College are eligible for the so-called "accommodation."

124.    The self-certification must be executed "prior to the beginning of the first plan year to which an accommodation is to apply." 78 Fed. Reg. at 39875.

125.    The Final Rule also extends the current Temporary Enforcement Safe Harbor through the end of 2013, only six months after the issuance of the Final Rule. 78 Fed. Reg. at 39889.

126.    Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer. If the organization has a self-insured plan, it would deliver the executed self-certification to the plan's third party administrator. 78 Fed. Reg. at 39875.

127.    If CNS Ministries and Heartland Christian College elect to invoke the "accommodation" with respect to the self-insured plan, they would be required to execute the self-certification and deliver it to the plan's third party administrator before January 1, 2014.

128.    By delivering its self-certification to its third-party administrator, CNS Ministries

and Heartland Christian College would trigger the third-party administrator's provision of or arrangement for payments for the morally abhorrent abortifacients. 78 Fed. Reg. 39892-39893. These payments constitute coverage of the items to which Plaintiffs object. *See, e.g., id.* at 39872 ("the regulations provide women with access to contraceptive coverage"). These payments also are treated as coverage under the consumer protection requirements of the Public Health Service Act and ERISA. *Id.* at 39876. This coverage will not be contained in any insurance policy separate from the self-insured plan in which CNS Ministries and Heartland Christian College participate.

129.    By issuing their self-certifications, CNS Ministries and Heartland Christian College would be identifying their participating employees to the insurer or third-party administrator for the distinct purpose of enabling the government's scheme to facilitate free access to abortifacient services.

130.    The insurer's third-part administrator's obligation to make direct payments for abortifacient services would continue only "for so long as the participant or beneficiary remains enrolled in the plan." 78 Fed. Reg. at 39876.

131.    Accordingly, CNS Ministries and Heartland Christian College would have to coordinate with its insurer or third-party administrator whenever it added or removed employees and beneficiaries to or from their healthcare plan and, as a direct and unavoidable result, to or from the abortifacient services payment scheme.

132.    The insurer or third-party administrator is required to notify plan participants and beneficiaries of the abortifacient payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan. 78 Fed. Reg. at 39876.  This would also require CNS Ministries and Heartland

Christian College to coordinate the notices with their insurer or third-party administrator.

133.    The insurer or third-party administrator is required to provide the abortifacient benefits "in a manner consistent" with the provision of other covered services. 78 Fed. Reg. at 39876-77.  Thus, any payment or coverage disputes presumably would be resolved under the terms of existing plan documents for CNS Ministries and Heartland Christian College.

134.    Thus, even under the accommodation, CNS Ministries and Heartland Christian College, along with every other non-exempt objecting religious organization, would continue to play a central role in facilitating free access to abortifacient services.  CNS Ministries and Heartland Christian College would be a *sine qua non* cause of the provision of the coverage that they sincerely oppose as a matter of religious belief and practice.

135.    Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive services will be "cost neutral for issuers," because "[s]everal studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health." 78 Fed. Reg. at 39877.  On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

136.    Nevertheless, even if the payments, over time, eventually resulted in cost savings in other areas, it is undisputed that it would cost money at the outset to make the payments. *See, e.g.,* 78 Fed. Reg. at 39877-78 (addressing ways insurers can cover up-front costs).

137.    Moreover, if the cost savings that allegedly will arise make insuring an employer's employees cheaper, the savings would have to be passed on to employers through reduced premiums, not retained by insurance issuers or administrators.

138.    HHS suggests that, to maintain cost neutrality, issuers may simply ignore this fact

and "set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants." 78 Fed. Reg. 39877.

139.   This encourages issuers to artificially inflate the eligible organization's premiums.

140.   Under this methodology—assuming it is even legal—the eligible organization would still bear the cost of the required payments for abortifacient services in violation of their consciences, as if the accommodation had never been made.

141.   Defendants have suggested that "[a]nother option" would be to "treat the cost of payments for contraceptive services . . . as an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations." 78 Fed. Reg. at 39878.

142.   There is no legal authority for forcing third parties to pay for services provided to the employees of eligible organizations under the accommodation.

143.   Furthermore, under the Affordable Care Act, Defendants lack authority in the first place to coerce insurers or administrators to make separate payments for contraceptive and abortifacient services for an eligible organization's plan participants and beneficiaries.

144.   Thus, the accommodation fails to protect objecting religious organizations for lack of statutory authority.

145.   For all these reasons, the accommodation does nothing to relieve non-exempt religious organizations with self-insured plans from being co-opted as the central cog in the government's scheme to force the free provision of contraceptive and abortifacient services even when the organizations object to facilitating those services.

146.   In sum, the accommodation is nothing more than a shell game that attempts to disguise the religious organization's role as the central cog in the government's scheme for

expanding access to contraceptive and abortifacient services.

147.     Despite the accommodation's convoluted machinations, a religious organization's decision to offer health insurance (which the ACA's employer mandate requires of employers of 50 or more employees) and its self-certification continue to serve as the sole triggers for creating access to free abortifacient services to its employees and plan beneficiaries from the same plan they are funding.

148.     CNS Ministries and Heartland Christian College cannot participate in or facilitate the government's scheme in this manner without violating their religious convictions.

149.     An actual, justiciable controversy currently exists between Plaintiffs and Defendants.  Absent a declaration resolving this controversy and the validity of the contraceptive mandate, Plaintiffs are uncertain as to their rights and duties in planning, negotiating, implementing and/or using their group health plans, their hiring and retention programs, their employment, and/or their social, educational, and other programs and ministries.

150.     Absent injunctive and declaratory relief against the offending portions of the contraceptive mandate, the Plaintiffs have endured and will continue to endure irreparable harm that outweighs any harm to the Defendants.

151.     The Plaintiffs are likely to succeed on the merits of their claims.

152.     An injunction, as sought by the Plaintiffs, would not adversely affect the public interest.

## CAUSES OF ACTION

### COUNT I
### Violation of the Religious Freedom Restoration Act

153.     The Plaintiffs incorporate by reference all preceding paragraphs.

154.   The Plaintiffs' sincerely held religious beliefs prohibit them from providing, funding or participating in the provision of coverage for abortions or abortifacients, or related education and counseling.  The Plaintiffs' compliance with these beliefs is a religious exercise.

155.   The Mandate creates government-imposed coercive pressure on the Plaintiffs to change or violate their religious beliefs.

156.   The Mandate exposes the Plaintiffs to substantial fines and penalties for their religious exercise or forces them to forfeit their right to employee health insurance.

157.   The Mandate exposes the Corporate Plaintiffs and Charles N. Sharpe to substantial competitive disadvantages, in that they will no longer be permitted to offer health insurance to employees.

158.   The Mandate imposes a substantial burden on the Plaintiffs' religious exercise, as to both belief and practice.

159.   The Government has no compelling governmental interest to require Plaintiffs to comply with the Mandate.

160.   The Mandate is not narrowly tailored to achieve any compelling governmental interest in a way that is least restrictive to Plaintiffs' rights.

161.   The Mandate and Defendants' threatened enforcement of the Mandate violate the Plaintiffs' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

162.   Absent injunctive and declaratory relief against the Defendants, the Plaintiffs have been and will continue to be harmed.

## COUNT II
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

163.    The Plaintiffs incorporate by reference all preceding paragraphs.

164.    The Plaintiffs' sincerely held religious beliefs prohibit them from providing, funding or participating in the provision of coverage for abortion or abortifacients, or related education and counseling.  The Plaintiffs' compliance with these beliefs is a religious exercise.

165.    Neither the Affordable Care Act nor the Mandate is neutral.

166.    Neither the Affordable Care Act nor the Mandate is generally applicable.

167.    Defendants have created categorical exemptions and individualized assessment exemptions to the Mandate.

168.    The Mandate furthers no compelling governmental interest.

169.    The Mandate is not narrowly tailored to be the least restrictive means of furthering Defendants' stated interests.

170.    The Mandate creates government-imposed coercive pressure on the Plaintiffs to change or violate their religious beliefs.

171.    The Mandate chills the Plaintiffs' religious exercise.

172.    The Mandate exposes the Plaintiffs to substantial fines for their religious exercise or forces them to forfeit their right to employee health insurance.

173.    The Mandate exposes the Corporate Plaintiffs and Charles N. Sharpe to substantial competitive disadvantages, in that they will no longer be permitted to offer health insurance to employees.

174.    The Mandate imposes a substantial burden on the Plaintiffs' religious exercise, as to both belief and practice.

175.    The Mandate is not narrowly tailored to achieve any compelling governmental interest.

176.    Despite being informed in detail of the fact that millions of Americans had beliefs similar to those of the Plaintiffs, Defendants designed the Mandate and the religious exemption to the Mandate in a way that made it impossible for the Plaintiffs to comply with their religious beliefs.

177.    Defendants promulgated both the Mandate and the religious exemption to the Mandate in order to suppress the religious exercise of the Plaintiffs and others.

178.    The Mandate and Defendants' threatened enforcement of the Mandate violate the Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

179.    Absent injunctive and declaratory relief against the Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT III
### Violation of the First Amendment to the United States Constitution
### Establishment Clause

180.    The Plaintiffs incorporate by reference all preceding paragraphs.

181.    By design, Defendants imposed the Mandate on some religious organizations but not on others, resulting in discrimination among religions and in a selective burden on the Plaintiffs.

182.    The Mandate and Defendants' threatened enforcement of the Mandate thus violate the Plaintiffs' rights secured to them by the Establishment Clause of the First Amendment of the United States Constitution.

32

183.    Absent injunctive and declaratory relief against the Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT IV
### Violation of the First Amendment to the United States Constitution
### Freedom of Speech
### *Compelled Speech*

184.    The Plaintiffs incorporate by reference all preceding paragraphs.

185.    The Plaintiffs teach and/or believe that abortion on demand violates their religious beliefs.

186.    The Mandate would compel the Plaintiffs to subsidize and participate in activities that they teach are violations of their religious beliefs.

187.    The Mandate would compel the Plaintiffs to provide, fund or participate in the provision of abortifacients and education and counseling related to abortion.

188.    Expenditures are a form of speech protected by the First Amendment.

189.    Defendants' actions thus violate the Plaintiffs' rights to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

190.    The Mandate's compelled speech requirement is not narrowly tailored to achieve a compelling governmental interest in a way least restrictive to Plaintiffs' rights.

191.    Absent injunctive and declaratory relief against the Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT V
### Violation of the First Amendment to the United States Constitution
### Freedom of Speech
### *Expressive Association*

192.    The Plaintiffs incorporate by reference all preceding paragraphs.

33

193.    The Plaintiffs teach and/or believe that abortion on demand violates their religious beliefs.

194.    The Mandate would compel the Plaintiffs to subsidize, fund or participate in the subsidization of activities that they teach are violations of their religious beliefs.

195.    The Mandate would compel the Plaintiffs to provide, fund or participate in the provision of abortifacients and education and counseling related to abortion.

196.    Defendants' actions thus violate the Plaintiffs' right of expressive association as secured to them by the First Amendment of the United States Constitution.

197.    Absent injunctive and declaratory relief against the Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT VI
## Violation of the Administrative Procedure Act

198.    The Plaintiffs incorporate by reference all preceding paragraphs.

199.    The Mandate is contrary to § 1303(b)(1)(A) of the Affordable Care Act, which provides that "nothing in this title" . . . "shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."  The Act also leaves it to "the issuer of a qualified health plan," not the Government, "[to] determine whether or not the plan provides coverage of [abortion]."  42 U.S.C. § 18023(b)(1)(A)(ii).

200.    The Defendants, in promulgating the Mandate, failed to consider the constitutional and statutory implications of the Mandate on organizations and individuals like the Plaintiffs.

201.    The Mandate is contrary to existing law and is in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

34

202.    Absent injunctive and declaratory relief against the Mandate, the Plaintiffs have been and will continue to be harmed.

**PRAYER FOR RELIEF**

Wherefore, these Plaintiffs request that the Court:

a.    Declare that the Mandate and Defendants' enforcement of the Mandate against these Plaintiffs violate the First Amendment to the United States Constitution;

b.    Declare that the Mandate and Defendants' enforcement of the Mandate against these Plaintiffs violate the Fifth Amendment to the United States Constitution;

c.    Declare that the Mandate and Defendants' enforcement of the Mandate against these Plaintiffs violate the Religious Freedom Restoration Act;

d.    Declare that the Mandate and Defendants' enforcement of the Mandate against these Plaintiffs violate the Administrative Procedure Act;

e.    Issue an order prohibiting Defendants from enforcing the Mandate against these Plaintiffs insofar as it requires them to provide, fund or participate in the provision of abortions or abortifacients, including Plan B, ella and copper IUDs, or related education and counseling;

f.    Award these Plaintiffs the costs of this action and reasonable attorney's and expert's fees pursuant to 42 U.S.C. § 1988 or as otherwise provided by law; and

g.    Award such other and further relief as it deems just and necessary.

OTTSEN, LEGGAT AND BELZ, L.C.

By:  /s/ Timothy Belz
Timothy Belz  #MO-31808
J. Matthew Belz  #MO-61088
112 South Hanley, Suite 200
St. Louis, Missouri 63105-3418
Phone: (314) 726-2800
Facsimile: (314) 863-3821
tbelz@omlblaw.com

Attorney for Plaintiffs

**Certificate of Service**

I hereby certify that on November 19, 2013, the foregoing was filed electronically with the Clerk of the Court for the United States District Court for the Eastern District of Missouri to be served by operation of the Court's electronic filing system upon the following registered CM/ECF participants:

Jacek Pruski
U.S. DEPARTMENT OF JUSTICE - CIVIL DIVISION
Federal Program Branch
20 Massachusetts Avenue, NW
P.O. Box 883
Washington, DC 20530

Christina Bahr Moore
OFFICE OF U.S. ATTORNEY
111 S. Tenth Street
20th Floor
St. Louis, MO 63102

/s/ Timothy Belz